# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

WILDERNESS WATCH, INC.,

    Plaintiff,

v.

BUREAU OF LAND MANAGEMENT, et al.,

    Defendants.

Case No. 2:09-CV-00302-KJD-GWF

**ORDER**

Currently before the Court is Plaintiff's Motion for Summary Judgment and Injunctive Relief (#54). Defendant BLM filed a Response (#57) and Defendant LVMPD filed a Response (#55), to which Plaintiff filed a joint Reply (#59). Defendant BLM has filed a Motion for Summary Judgment (#56) and Defendant LVMPD has also filed a Counter-Motion for Summary Judgment (#58). Plaintiff filed a joint Response (#60) to which Defendant BLM filed a Reply (#62) and Defendant LVMPD filed a Reply (#63).

**I. Background**

Las Vegas Metropolitan Police Department ("LVMPD") is required to provide search and rescue services to all areas within Clark County, Nevada. See NRS 248.092. In addition, under agreements with the United States Bureau of Land Managment ("the BLM"), LVMPD is responsible

for all search and rescue operations on BLM lands within Clark County, which includes the Red Rock National Conservation Area ("Red Rock NCA"), and the La Madre Mountain and Rainbow Mountain Wilderness Areas, the eastern portions of which are located within the Red Rock NCA. Rescues within the rugged terrain of these areas often require both helicopter and ground crews using high angle rescue techniques.

The La Madre Mountain and Rainbow Mountain Wilderness Areas were designated wilderness areas on November 6, 2002 by the Clark County Conservation of Public Land and Natural Resources Act of 2002 ("the Act"). In 2005, after being informed of the wilderness designation and the restrictions such status placed on LVMPD's ability to train, LVMPD requested permission from the BLM to conduct helicopter pilot training and helicopter-assisted search and rescue training in areas designated by the Act as wilderness. On October 30, 2007, the BLM issued an Environmental Assessment ("EA") that analyzed the potential impacts and alternatives, including a "no action" alternative, at LVMPD's request.

On November 20, 2007, the BLM issued a Minimum Requirements Decision Guide ("MRDG"), analyzing the applicability of an exception to the Wilderness Act prohibition on aircraft landing for the LVMPD helicopter training. Concurrently, the BLM released its Decision of Record Rationale, Finding of No Significant Impact ("DRR/FONSI") adopting the EA's proposed action. That finding authorized LVMPD to conduct search and rescue training at designated sites within the wilderness areas, including the landing of helicopters, for a total of forty-eight (48) hours in a calendar year, with no limitations on the number of days during which the training could occur, or time of season. The hour limitation does not include search and rescue training in wilderness areas that do not require the use of aircraft or motorized equipment, or pilot training that does not include landing or deployment of personnel or equipment in the wilderness areas.

Plaintiff appealed the BLM's DRR/FONSI to the Interior Board of Land Appeals ("IBLA") asserting that the BLM violated the Wilderness Act of 1964 ("the Wilderness Act") and the National Environmental Policy Act ("NEPA"). On September 25, 2008 the IBLA rejected the appeal and

affirmed the BLM's decision. On February 13, 2009, Plaintiff filed the instant action against the BLM and its officers alleging that the BLM's decision violated the Wilderness Act and NEPA. LVMPD moved to intervene as a defendant and this Court granted their motion on October 7, 2009. Plaintiff seeks to enjoin LVMPD's search and rescue training operations in the La Madre Mountain and Rainbow Mountain Wilderness Areas and seeks an order requiring the BLM to prepare an Environmental Impact Statement. After the parties submitted initial briefing on motions for summary judgment, this Court ordered the parties to re-brief the matter in light of Wilderness Watch v. U.S. Fish and Wildlife Service, 629 F.3d 1024 (9th Cir. 2010).

**II. Legal Standard**

This Court reviews the actions of the BLM under the Administrative Procedure Act ("APA"). See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61 (U.S. 2004). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). Instead, a court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means that agency decisions are overturned

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Sierra Forest Legacy v. Sherman, 2011 WL 2041149 (9th Cir. May 26, 2011). "The standard is deferential. The court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action. . . . The agency's action need only be a reasonable, not the best or most reasonable, decision." River Runners, 593 F.3d at 1070 (citations, quotation marks, alterations omitted).

/////

/////

3

### III. The Wilderness Act

The Ninth Circuit's recent <u>Wilderness Watch</u> decision provides an appropriate model for review of an agency action involving an interpretation of the Wilderness Act. <u>Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.</u>, 629 F.3d 1024 (9th Cir. 2010). In this case the BLM has interpreted the prohibition on motorized vehicle or aircraft use in wilderness areas and its exceptions, holding that helicopter training is part of the exception for maintaining health and safety in emergencies. <u>See, e.g.</u>, AR 438, 439, 442, 456-57, 466.

### A. The BLM's Interpretation of the Act

The court in <u>Wilderness Watch</u> started by noting that the "Wilderness Act prohibits the development of 'structure[s] or installation[s]' on the land 'except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter.'" <u>Id.</u> at 1032 (quoting 16 U.S.C. § 1133(c)). The court then examined the government agency determination that conservation of bighorn sheep counted as a purpose of the Act and asked whether that determination was unambiguously contrary to the language of the Wilderness Act. 629 F.3d at 1032.

The instant case is similar: in the same subsection, the Wilderness Act also indicates that there shall be "no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, [and] no other form of mechanical transport" within wilderness areas, a restriction that clearly applies to the helicopter activities at issue in this case. 16 U.S.C. § 1133(c). This case also involves an exception to the restriction, found in the same subsection, for "measures required in emergencies involving the health and safety of persons within the area . . . ." <u>Id</u>. Just as in <u>Wilderness Watch</u>, therefore, this Court must ask whether it was unambiguously contrary to the language of the Wilderness Act for the BLM to determine that helicopter search and rescue training falls under the emergency exception to the motorized vehicle and aircraft prohibition.

As the court noted in <u>Wilderness Watch</u>, the Wilderness Act starts with a broad statement of purpose that focuses on preserving and protecting wilderness lands "in their natural condition." 629 F.3d at 1033 (quoting 16 U.S.C. § 1131(a)). The Act, however, also includes language emphasizing

the responsibility to preserve wilderness lands for a variety of uses by humans: "recreational, scenic, scientific, educational, conservation, and historical." 629 F.3d at 1033 (quoting 16 U.S.C. § 1133(b)).  This language makes it clear that "Congress did not mandate that [government agencies] preserve the wilderness in a museum diorama, one that we might observe only from a safe distance, behind a brass railing and a thick glass window." 629 F.3d at 1033.  The Wilderness Act therefore includes directions to agencies to maintain the wilderness as it was prior to human interaction along with directions to maintain the wilderness in such a way that humans can enjoy it for a variety of purposes.

As was the case Wilderness Watch, this Court finds that Congress has given "conflicting policy directives" to the BLM: on the one hand to maintain these wilderness areas free from the noise and disruption that accompany helicopter flights, and on the other hand to maintain the safety of the individuals using these wilderness areas.  Id.  Such "competing instructions call for the application of judgment and discretion" on the part of the BLM; in cases such as this one that are not at the margins, a court cannot "identify precisely what the [BLM] must do and must not do." Id.  As the court did in Wilderness Watch, therefore, this Court will also grant deference to the BLM's determination that helicopter search and rescue training falls under the emergency exception to the prohibitions related to helicopters.

Next, the Wilderness Watch court found that the agency action did not have the force of law, and that the court owed Skidmore deference to the agency's determination rather than Chevron deference.  629 F.3d at 1034-35.  Even though the agency's decision was "subject to public review and comment," the court found that it could not be distinguished from "interpretations contained in policy statements, agency manuals, and enforcement guidelines," all of which receive only Skidmore deference.  629 F.3d at 1035 (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)).  None of the parties before us argue directly that the BLM's decision should be granted Chevron deference; since the BLM action in this case is sufficiently similar to the agency decision in

Wilderness Watch, this Court assumes, without deciding, that the BLM's action should receive Skidmore deference.[1]

Under Skidmore, a court will consider an agency's decision based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." United States v. Mead Corp., 533 U.S. 218, 228 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). The Wilderness Watch court found that the agency was correct to interpret the Wilderness Act to include bighorn sheep conservation as a purpose because the protection of bighorn sheep had been part of the management of the area historically and because the record demonstrated that the agency had considered the matter in a thorough and reasoned manner. 629 F.3d at 1035-36.

Similarly in this case the record indicates that helicopter search and rescue training has been carried out for over four decades in these wilderness areas as part of the provision of safety through emergency rescue services for individuals using the wilderness areas. AR 439. The BLM's discussion of this history demonstrates consistency. The BLM's decision-making process also demonstrates thoroughness in the drafting and comment process conducted for each document as evidenced throughout the record. And the proposition itself—that helicopter search and rescue training is so closely linked with performance of helicopter rescue services that the provision of one involves the provision of the other—is self-evidently reasonable. Therefore, using Skidmore deference, this Court finds that the BLM's reasoning was "thorough, valid, consistent, and persuasive." 629 F.3d at 1036. As a result this Court defers to the BLM's interpretation that helicopter training falls under the emergency safety exception of the Wilderness Act.

/////

/////

---

[1] The BLM briefly mentions Chevron deference without going into the details of the Chevron analysis or offering a detailed justification for why this Court should give such deference in this case. Even if the BLM's decision did receive Chevron deference, however, the same conclusions would follow since Chevron involves a higher level of deference to agency action. United States v. Mead Corp., 533 U.S. 218, 228-231 (2001).

**B. Necessity**

After finding in favor of the agency's interpretation of the Wilderness Act, the Wilderness Watch court considered whether the agency had made "an adequately reasoned determination of necessity." Id. In Wilderness Watch the agency failed to make a finding that the agency action was "necessary to meet the minimum requirements" of the Act. Id. at 1037. Specifically, the agency mentioned several different options that could have provided for the conservation of bighorn sheep, but then went on to assume that one of the options was necessary instead of considering and comparing the various options. Id.

Plaintiff argues that the BLM should have considered other alternatives such as using training sites outside of the wilderness areas, closing off sections of the wilderness areas or requiring appropriate climbing equipment to reduce the number of emergency rescues, and not using helicopters in some of the emergency rescues. The first of these options was considered at length by the BLM and ultimately incorporated to some extent into the final decision. The extreme version of this alternative, that of prohibiting all helicopter search and rescue training in the wilderness areas under any circumstances, was considered and rejected by the BLM because it did not meet the minimum requirements of providing for the health and safety of the public.

Unlike in Wilderness Watch, where alternative action plans were available that could fully provide for the important purpose of increasing sheep population without violating the prohibition on structures, as long as there is a need for helicopter search and rescue in the wilderness areas those conducting the search and rescue must be trained, and that training requires the use of helicopters in the wilderness areas. In Wilderness Watch the agency "assum[ed] that improvements to water facilities were necessary" without ever actually finding that they were necessary or discussing why they were necessary. 629 F.3d at 1037. In this case, on the other hand, the BLM has clearly stated that, while much of the helicopter search and rescue training can take place outside of the wilderness areas, "some training needs to also occur on landing sites within the very canyons and cliffs of the wilderness where rescue operations will take place . . . ." AR 457.

Not only did the BLM state this conclusion clearly in the record, rather than making an implicit assumption as the agency did in Wilderness Watch, but they also provided the reasoning behind the conclusion.  The BLM determined that other non-wilderness area training sites, while useful for many training purposes, do not have "the same terrain and weather patterns" as the wilderness area sites in the proposal. AR 439.  As a result, the BLM found that "skills utilized on big wall cliffs and within narrow and confined canyons cannot be replicated" at non-wilderness training sites. AR 443.  Therefore, according to the BLM, wilderness area sites must be used in at least some of the training "in order for pilots to simulate actual rescue conditions" and thereby be fully trained for actual rescues. AR 457.  The specific sites chosen by the BLM in the wilderness areas are in fact the very locations where previous rescues have taken place. AR 439.  As the BLM puts it, "[s]ome of these landing sites are highly technical and require pilot familiarity in order to be used safely . . . ." AR 459.  If search and rescue team members are "unfamiliar with the terrain" because they have never practiced on the actual site in the wilderness area, they would not be able to provide for their own safety and the safety of the public during a rescue. AR 447.

The other two alternatives proposed by Plaintiff—reducing the number of rescues by closing parts of the wilderness or requiring climbing equipment and doing some rescues without helicopters—could help reduce the number of emergencies involving helicopter rescue.  However, even with a reduction in use of the wilderness areas and a reduction in the likelihood of emergency situations arising during such use, no alternatives have been proposed that would completely eliminate emergency situations in the wilderness areas.  Given the probability (however small it may become) that emergencies will arise requiring helicopter search and rescue efforts by LVMPD, helicopter training is necessary, and that includes helicopter training in the wilderness areas as laid out by the BLM.  The only way to eliminate this necessity would be to completely eliminate the need for helicopter rescues, which would mean completely eliminating access to the wilderness areas.  Although Plaintiff hints at such a conclusion, it is clearly at odds with several of the stated purposes of the Wilderness Act, and the BLM did not err in ignoring it as an alternative.

Plaintiff also argues that the amount of helicopter search and rescue training approved in the wilderness areas is not the minimum required.[2] The BLM considered several different possible levels of helicopter search and rescue training in the wilderness areas, including the 70 hours per year originally proposed by LVMPD, and ultimately concluded that the minimum necessary amount would be 48 hours. The record reflects the BLM's reasoning in arriving at this conclusion, including comparisons to helicopter training in wilderness areas at Yosemite National Park. AR 444. The record specifically states that the BLM chose the 48 hour option because it would allow search and rescue personnel to be "fully trained" while at the same time mitigating the intensity of the noise generated by the original LVMPD proposal of 70 hours. This determination involved a difficult balancing between the goal of improving rescue efforts through training and the goal of maintaining the wilderness areas free from helicopter noise; the BLM ultimately concluded that 48 hours was the minimum amount allowed even though they noted that granting only 48 hours of training time per year "may cause rescue personnel to back off in weather situations that they might have been more willing to work in had they trained to the level" proposed by LVMPD. AR 462. Plaintiff does not offer any reasons why some smaller amount of wilderness area training (other than zero hours) would meet the minimum requirements of the emergency purposes of the Act, and even if Plaintiff had made a reasoned argument in favor of some smaller amount, the BLM's decisions must be given the appropriate deference.

---

[2] Plaintiff specifically argues that crew training in the wilderness is not required, citing wording in the MRDG that seems to imply that the approved alternative did not involve crew training with helicopters in the wilderness: "Search and rescue crew training without helicopters, motorized, or mechanized transportation may occur within the wilderness as needed. Search and rescue crew training with helicopters would take place as needed on any of the ... cliffs and canyons outside the wilderness." It is true that this language would allow for such an interpretation, especially with language in the prior section that seems to be discussing only pilot training and nothing else. The language does not foreclose the opposite interpretation, however: to say that crew training without helicopters may occur within the wilderness and that crew training with helicopters would take place in a particular list of places outside the wilderness does not necessarily say anything about whether crew training with helicopters may also take place within the wilderness. And when the context of the EA and the rest of the MRDG is considered, it is clear that the BLM took the position that crew training with helicopters within the wilderness was part of the minimum plan considered and ultimately approved.

9

Mountain flying is one of the more dangerous activities undertaken by general aviation aircraft. It often presents special challenges that cannot be replicated in flight simulators or elsewhere. This is especially true in rescue operations where aircraft are working close to the terrain and with narrow margins. The unique formations that are present in the subject areas, and which likely played a significant role in wilderness designation, provide ample justification for on-site training. Wind coming off the mountains and cool air funneling through passes and mixing with the heated air of the valley floor can and does create air turbulence. The consequence of not adequately training for operations in such terrain is a greatly increased risk of injury or death, not only to the imperiled, but also to those who would respond. Pilots and rescue personnel cannot reasonably be expected to venture into subject areas without adequate training and preparation. It has been said that only fools rush in (or, in this case, expect others to rush in) where angels fear to tread. The determination of the BLM that 48 hours would meet the <u>minimum</u> requirements of training for emergency purposes is entitled to deference.

This Court finds the BLM's conclusions to be correct, but even if this Court disagreed with the BLM's decisions, the BLM has certainly laid out a reasoned case for the plan they approved. None of the BLM's explanations are implausible; in fact, all are eminently reasonable. Therefore, on the issue of the minimum amount of training necessary to fulfill the purposes of the Act, this Court will not substitute its own judgment (or the judgment of the Plaintiff) for that of the government agency Congress has entrusted with such decisions.

**C. Established Use**

The BLM also justifies its approval of helicopter search and rescue training in wilderness areas by pointing out that aircraft use that has "already become established" prior to wilderness designation "may be permitted" under of the Wilderness Act. AR 455 (quoting 16 U.S.C. § 1133(d)(1)). The BLM goes on to conclude that this provision allows for approval of helicopter training in the wilderness since "helicopter landing associated with search and rescue training occurred prior to wilderness designation." AR 455. This historic practice, which began as early as

1970, "occurred in Red Rock Canyon for up to 14 days a year, with no limitation on duration or locations." AR 439, 447. See also AR 442 ("search and rescue training is consistent with past practices in the National Conservation Area").

Plaintiff claims that since the DRR/FONSI rationale section talks about health and safety of visitors the established use justification is not available to the BLM, citing a number of Ninth Circuit opinions. But offering one rationale does not necessarily preclude another, and the citations above that show the established use rationale come not only from the record but specifically from the decision documents, including both the EA and the MRDG. None of the cases cited by Plaintiff require that an agency rely exclusively on rationales found in the DRR/FONSI. This Court finds that the BLM is both justified in advancing the established use argument and correct in concluding that the established use exception allows for the wilderness area helicopter training at issue in this case. This 16 U.S.C. § 1133(d)(1) rationale is an independently adequate justification for the BLM's decision, in addition to and apart from the prior analysis of the BLM's reasoning under 16 U.S.C. § 1133(c).

**IV. NEPA**

NEPA requires the BLM to prepare an environmental impact statement ("EIS") for "Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). However, "an agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter 'environmental assessment' (EA), that the proposed action will not have a significant impact on the environment." Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2750 (2010) (citing 40 C.F.R. §§ 1508.9(a), 1508.13). Plaintiff argues that the BLM violated NEPA by producing a deficient EA and then failing to produce an EIS when an EIS was necessary.

**A. Cumulative Impacts**

Plaintiff alleges that the EA is deficient in this case because it fails to analyze the potential for cumulative impacts on the wilderness, citing regulations explaining cumulative impact:

11

> "Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Plaintiff specifically mentions other actions such as actual search and rescue missions, helicopter flights over the wilderness for monitoring and law enforcement purposes, and construction of a helispot during a firefighting emergency. Plaintiff alleges that the EA would need to include a quantified analysis of how impacts from the search and rescue training would interact with impacts from these other actions, citing the Ninth Circuit's decision in <u>Klamath-Siskiyou Wildlands Ctr. v. BLM</u>, 387 F.3d 989 (9th Cir. 2004).

In <u>Bering Strait Citizens for Responsible Res. Dev. v. United States Army Corps of Eng'rs</u>, 524 F.3d 938, 954 (9th Cir. 2008), however, the Ninth Circuit distinguished situations like the one in <u>Klamath-Siskiyou</u> that require a quantified assessment of cumulative impacts from situations in which there are no other projects or actions with impacts of comparably significant magnitude that might accrue alongside the impacts of the proposed project. While <u>Klamath-Siskiyou</u> involved EAs that failed to analyze the cumulative effects of multiple timber sales of comparable size, <u>Bering Strait</u> involved an EA that only analyzed a single mining project while not including an analysis of the cumulative effects of other, smaller mining projects in the area. The Court in <u>Bering Strait</u> concluded that an EA does not always need to consider all potential cumulative effects, especially those from relatively insignificant projects or actions.

The flyovers cited by Plaintiff would not have comparable significance and environmental impact since they would not involve landings; the record does not even indicate that they would involve helicopters entering the canyons. The EA was therefore not deficient in failing to analyze the cumulative impact of flyovers.

While the firefighting helispot creation did involve helicopter landing that may have had comparable impacts to the temporary audible and visual disruptions of search and rescue trainings,

1  the impacts of the emergency helispot that are related to the current project occurred in the past and
2  did not continue on in any meaningful way to the present.  The record reflects the unique nature of
3  the action as well as planning being taken by the agency to avoid any such action in the future.
4  Given the temporary nature of the disruption impact created by helicopter landings, these past
5  impacts could not interact with impacts from the rescue training in such a way that the "total impact
6  ... [would] be greater than the sum of the parts," Klamath-Siskiyou, 387 F.3d at 994.  This Court
7  therefore finds that their transitory and limited nature make them irrelevant for purposes of
8  cumulative impact analysis.

9        Future emergency responses, such as helispot creation or search and rescue missions, could
10 fall under the category of "reasonably foreseeable future actions" that require cumulative effects
11 analysis.  However, while it may be generally foreseeable that some such actions will be necessary in
12 the future, the details are not sufficiently foreseeable to allow for the quantified, detailed analysis
13 Plaintiff demands.  See Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1123 (9th Cir. 2002)
14 (overruled in part on other grounds, Wilderness Soc'y v. United States Forest Serv., 630 F.3d 1173
15 (9th Cir. 2011)) (holding that "the potential cumulative effects of [a project were] too speculative to
16 be amenable to in-depth analysis").  This Court finds that the lack of such detailed discussion in the
17 EA is therefore also acceptable.

18       Thus none of the other actions mentioned by Plaintiff would require any additional analysis
19 of cumulative impacts.  The BLM need not invent other actions or pretend that other actions will
20 have cumulative impacts in order to generate a sufficiently lengthy or impressive cumulative impacts
21 section in an EA.  Just as in Bering Strait, this EA "succinctly but adequately discusses the
22 cumulative impacts of the project," while also pointing out that the overall effect of the project will
23 have a net positive effect on the environment due to mitigation measures.  524 F.3d at 954.  The
24 BLM concludes in this EA that the proposed action would actually represent a decrease from
25 historical levels of training activity; the cumulative impact of approving the project would therefore
26 be to limit the negative environmental impacts from training when analyzed alongside past actions.

AR 447. Since there are no other actions that would lead to a collectively significant impact when combined with the search and rescue training, the cumulative impacts discussion in the EA is sufficient.

**B. Impacts to Wildlife**

Next Plaintiff argues that the EA is deficient because it should have provided a more lengthy and thorough discussion about the impacts to wildlife. Plaintiff argues that the EA should have discussed other sensitive species that inhabit the affected area and that existing discussions about the impacts on bighorn sheep and desert tortoises should have relied on scientific discussions or data. Plaintiff also argues that information in the record about wildlife contradicts the conclusions in the EA.

However the cases cited by Plaintiff involve impacts to wildlife on a far different scale than the potential impacts in the instant case from a noisy helicopter overhead. Given the plan approved by the BLM, most wildlife in the wilderness areas are unlikely to ever experience these possible negative impacts, and those that do will likely only experience them at most once a year for an hour or two when the helicopter training takes place at the relevant site near their habitat.

Furthermore, the only evidence cited by Plaintiff that contradicts the EA's wildlife conclusions is a single statement by a BLM employee that bighorn sheep "may abandon the area if human activities reduce the quality of their habitat." AR 433. This is a conditional statement, and a qualified one at that. Nothing in the EA comes close to contradicting it, including the EA's assertion that impacts to wildlife are "temporary." The cases cited by Plaintiff deal with wildlife impacts on a significantly different scale than the impacts in this case. This Court therefore concludes that the discussion of wildlife impacts is sufficient as well.

**C. Reasonable Range of Alternatives**

Finally Plaintiff argues that the EA is insufficient because it fails to consider reasonable alternatives, such as alternatives that would lessen the need for search and rescue operations. But the BLM is not required to consider "alternatives whose effect cannot be reasonably ascertained, and

14

whose implementation is deemed remote and speculative. Nor must [the BLM] consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." Headwaters, Inc. v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th Cir. 1990) (citations, quotation marks omitted). The results of the alternatives proposed by Plaintiff are speculative, since it is unclear how the public would respond to BLM initiatives or restrictions. Furthermore, all of the alternatives proposed by Plaintiff are contrary to the purposes to which wilderness areas shall be devoted under the Wilderness Act, including "recreational, scenic, scientific, educational, conservation, and historical use." 16 U.S.C. § 1133(b). In order to count as a legitimate alternative to the proposed course of action, Plaintiff's alternatives would have to adequately address the issue of safety in emergency situations, and the only other way to do that would be to completely restrict human usage, as discussed above. Thus these proposals are unreasonable, and this Court finds it was unnecessary for the BLM to consider them in the EA.

**D. Failure to Produce an EIS**

Plaintiff also argues that an EIS should have been prepared because the EA identifies significant impacts from the proposed action. Plaintiff starts by misreading the DRR/FONSI's statement that "potential for significant impacts to wilderness and natural resources are adequately addressed" to mean that there *is* a potential for significant impacts, rather than the clearly intended meaning that any aspect of the situation that might have been thought to involve significant impacts had been proven to be devoid of any significant impacts. AR 466. Plaintiff goes on to cite several instances where the word "significantly" was used in the EA, as well as several straightforward statements about the potential environmental impacts of the training from the MRDG including the possibility that the proposed action may disrupt wildlife or damage rock art in the area.

Plaintiff is correct that the BLM discussed a variety of different possible impacts from the proposed action. Under NEPA, however, this is evidence that the BLM is conforming with the "procedural requirements" that have been put in place to "ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant

15

environmental impacts." Winter v. NRDC, Inc., 129 S. Ct. 365, 376 (2008) (citations, quotation marks, alterations omitted). The BLM correctly considered each of these possible impacts in its final conclusion that there would be no overall significant impacts resulting from the proposed action. The rest of Plaintiff's argument is nothing more than a rehashing of the ways in which Plaintiff believes the search and rescue training will violate the provisions of the Wilderness Act, arguments this Court has already discussed exhaustively above.

"We . . . find it pertinent that this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment." Id. The activities that the BLM has approved have been taking place for many years within these wilderness areas without any significant or even measurable permanent effect. Plaintiff provides no explanation as to why a decrease in those actions as approved under the BLM plan would lead to new harmful impacts on the environment. This Court therefore finds the BLM's actions reasonable and fully compliant with the requirements of NEPA.

## V. Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment and Injunctive Relief (#54) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant BLM's Motion for Summary Judgment (#56) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant LVMPD's Counter-Motion for Summary Judgment (#58) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court enter **JUDGEMENT** for Defendants and against Plaintiff.

DATED this 29th day of June 2011.

_____
Kent J. Dawson
United States District Judge

16